## SECOND DEPARTMENT, APRIL, 1975

## (April 3, 1975)

█ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WAYNE JOHNSTON and GEORGE FREED, Appellants.—Appeals from two judgments of the Supreme Court, New York County, Central Narcotics Part, in a Queens County case, both rendered October 1, 1973, convicting defendants of criminal possession of a dangerous drug in the fourth degree, upon a jury verdict, and imposing sentences. Judgments reversed, on the law and as a matter of discretion in the interest of justice, and new trial ordered. Defendants were jointly indicted and tried, along with one Michael Papa, for the crimes of selling a dangerous drug in the first degree, possession of a dangerous drug in the first degree and possession of a dangerous drug in the fourth degree with intent to sell, all arising out of an alleged sale of about 18 ounces of cocaine to undercover police officers on July 3, 1972 in Queens County. After a jury trial, in which they raised the defense of entrapment, defendants were convicted of fourth degree possession, a class D felony (Papa was convicted of first degree possession, a class A felony). Defendants did not testify. The somewhat incredible background of this prosecution is as follows: Ira Silverman, an investigative reporter for the National Broadcasting Company, met Police Sergeant David Durk during the course of the Knapp Commission hearings.[1] They became friends and developed a sort of working relationship with respect to further investigations of corruption. About the early part of 1972 Silverman, and then Durk, became interested

---

1. The Knapp Commission was created by former Mayor John V. Lindsay in May, 1970 to investigate allegations of police corruption in the City of New York.

in alleged corruption in the office of Queens District Attorney Mackell. Defendant Freed came to Silverman's attention through one of the latter's apparent sources, one Paul Taylor, who claimed that Freed had known of the indictment of one Seymour Thaler weeks before it occurred. Freed allegedly boasted of having excellent political connections and implied that he could fix cases in the Queens District Attorney's office. He also claimed he had made $7,000 with Mackell the year before. Silverman's early investigation of Freed was multifaceted, involving police and political corruption, stolen cars, stolen guns, pimping and F. H. A. frauds. Freed, at the time, claimed to be in very bad financial straits and was desperately looking around for ways to make some money. It was through Freed that Silverman met defendant Johnston. Silverman helped Johnston by getting him a tutor to teach him how to read and write; and, at the request of either Freed or Johnston or both, got one Tommy Bambrick, a heroin addict, into a drug program. (Bambrick subsequently reverted to drugs and died of an overdose.) Silverman was well aware that Freed and Johnston might feel indebted to him for his favors and that he could use the prospect of making money to try to "promote" Freed into committing a crime. In May, 1972 Silverman's investigative efforts centered around guns. He claimed to have actually told Freed that the police, and particularly Sergeant Durk, were interested in guns and that he was, in effect, inquiring as an "agent" of the police. Despite having been told this, Freed, in exchange for a "brokerage" fee, allegedly volunteered to help recover a large quantity of guns, apparently part of a shipment stolen en route to the Police Department. Silverman told him he would have to talk to the police about the fee and warned Freed that someone might end up under arrest if the guns were, in fact, recovered. Thereafter, a meeting was held between Freed, Johnston and Silverman and, on May 16, 1972, Johnston gave Silverman a .38 caliber Smith & Wesson Police Special, which Silverman showed to the police. On May 25, 1972 supervisor police officers held a conference, which included Deputy Chief Inspector Bonacum of the Narcotics Division, Deputy Inspector Leonard, who was commanding officer of the Special Investigations Unit, Sergeant Durk, Ira Silverman and others. It was Durk's and Silverman's idea to make a case on guns against Freed and then, by holding prosecution thereon over his head, induce him to go into the Queens District Attorney's office. There was also some discussion as to whether they should reveal their plans to go to the New York County District Attorney. Leonard thought the plan was crazy, but he deferred to Durk, out of concern that Durk would go to the New York Times and say that he (Leonard) had "blown" the case. Bonacum was apparently wary of Durk, for he tape-recorded the conference. Nor did he place too much faith in Freed, for he suggested that they first test out Freed's ability to fix a case in Queens by getting another police officer, Spinelli, arrested and furnishing him with money to fix the case. Bonacum thought an alleged prior fix by Freed, related by Silverman and involving an automobile moving violation against Tommy Bambrick, was nonsense. In any event, on May 29, 1972 Silverman introduced Detective Spinelli to Freed as Johnny Russo, a firearms instructor for a militant Jewish organization. The next day, Spinelli also met Johnston. They met again on May 31, 1972 and June 9, 1972. However, apparently nothing came of the gun investigation and Inspector Leonard suggested that Spinelli try to buy drugs from Freed. They did not think that Freed, who had no criminal record, was a major narcotics dealer, but there was an indication that he knew addicts (Bambrick probably), and Spinelli had allegedly seen Johnston sniff cocaine. Also, a class A drug felony arrest would be the

perfect "hammer" to hold over Freed's head to convince him to co-operate and go into the Queens District Attorney's office. Spinelli brought up the matter of drugs with Freed almost as an afterthought to another conversation. Spinelli said he had a friend who had a bar upstate and that a lot of money could be made if drugs could be obtained. Freed said he would find out and let Spinelli know. The next day, Freed called Spinelli and said he was trying to locate his drug connection, who was Johnston. Johnston, when located, said that he had to call his own connection, who "has them", and that he would meet Spinelli later. Spinelli, Freed and Johnston met again on June 16, 19, 21 and 22. (Allegedly, on one or two of these dates, Freed and Johnston sold Spinelli a small quantity of cocaine, which sale or sales are the subject of another indictment, yet untried, against Freed and Johnston only.) Discussions with respect to a class A sale, namely 30 ounces of cocaine for $20,000, commenced on June 22. The sale was continually delayed, due both to Freed's and Johnston's inability to obtain the desired amount and the fact that the Police Department had run out of "buy" money. Finally, on July 3, 1972, Spinelli purchased about 18 ounces of cocaine for $13,400. The sale took place outside the Boulevard Diner in Queens. Present were Spinelli and another undercover officer named Caggiano, and Freed, Johnston and Papa. Other police officers observed the parties from a discreet distance. Freed received $1,500 as a "brokerage" fee and Johnston $1,000, which he allegedly split with Papa, his drug supplier. Neither Freed, Johnston nor Papa was arrested after the July 3 sale. Rather, on July 5, Spinelli met with Freed and drove him to a spot where perhaps eight police officers were waiting. At gunpoint, Freed was taken from the car, handcuffed and driven into Manhattan, to the office of the New York County District Attorney. Freed was then taken to the office of an Assistant District Attorney, whom Durk had been consulting about this entire scheme since late June. There, several persons, and particularly Leonard and Durk, attempted to "persuade" Freed to penetrate the Queens District Attorney's office. Freed insisted he had never fixed anything bigger than a jury notice, but Durk did not believe him. Finally, after being "reminded" that he faced a life sentence for the drug sale, Freed agreed to co-operate. It was decided that he would be "wired" and sent to see a certain individual in the Queens District Attorney's office. The plan was actually set in motion on July 14, but Freed immediately "blew it". To the horror of the waiting Special Investigations Unit team, Freed was arrested on the spot by members of Mackell's office on a charge of bribery and taken to the 112th precinct for booking. However, Deputy Commissioner McCarthy interceded and stopped the booking. Johnston and Papa were immediately arrested and they, together with Freed, were then arraigned in New York County upon a charge of conspiracy to sell narcotics. This charge, which was intended to keep them out of the clutches of the Queens County authorities, was dismissed when they were subsequently indicted in Queens County, charged with a class A sale and which resulted in their conviction of a class D felony (fourth degree possession). Upon the trial Papa vigorously disputed the happening of the drug sale, while Freed and Johnston essentially accepted the prosecution testimony of a sale and concentrated on their entrapment defense. However, Freed and Johnston did assail the proof as to the exact nature and quantity of the substance sold, as well as raising an issue as to their intent.[2] In his instructions to the jury, the Trial Justice charged as

2. The dispute as to the nature of the substance sold stemmed, in large part, from the fact that the narcotics exhibits, when opened upon the trial, did not contain a

follows: "By claiming the defense of entrapment they *concede* that on July 3rd, 1972, they [Freed and Johnston] were present in the vicinity of the Boulevard Diner, in the County of Queens, City and State of New York, and that they did participate in the offer of and aid in the transfer of a quantity of narcotic drugs, more specifically: cocaine, in excess of sixteen ounces for a set sum of money" (emphasis and bracketed matter added). Counsel objected to this instruction to no avail and, upon the subsequent request of the jury, the court reread the instruction, with counsel objecting again. The basic and fundamental error in this instruction is obvious, for it asserted the guilt of defendants as a fact, thus relieving the prosecution of its burden of proving their guilt beyond a reasonable doubt and afforded defendants an opportunity for an acquittal only if they proved their defense of entrapment. Entrapment is obviously a defense fraught with great risk to a defendant who seeks its benefits and at the same time also denies commission of the acts charged. However, in New York a defendant may raise inconsistent defenses and may not be compelled to admit his guilt as a condition of invoking the defense of entrapment *(People v Felder,* 39 AD2d 373, affd 32 NY2d 747 on opn at App Div, app dsmd 414 US 948; *People v Chambers,* 56 Misc 2d 683; see, also, *Sears v United States,* 343 F2d 139; *People v Perez,* 44 Cal Rep 326). The instruction that these defendants conceded their guilt by raising the entrapment defense was thus prejudicial error beyond peradventure. Furthermore, the trial court should have explicitly related the charge on the subject of entrapment to that on proof beyond a reasonable doubt. The latter instruction was given early in the charge. Moreover, instead of simply reiterating, at the close of the charge, that the jury should first determine whether the prosecution had proved all the material elements of the crimes charged beyond a reasonable doubt and then, if they so found, should consider the defense of entrapment, i.e., whether defendants were caused to commit the crimes by means of entrapment, the trial court did just the opposite. It instructed the jury that if it rejected the entrapment defense it should determine guilt or innocence in accordance with the law as previously charged. If this was not a serious dilution of the People's burden of proof, it was, at the very least, a confusing *non sequitur.* That the jury most likely followed the court's charge and first considered the entrapment defense is evidenced by the fact that a rereading of the instruction as to that defense was one of the first of its many requests in the course of long deliberations. Another basic error was the trial court's refusal to charge the law of agency. It is settled law that a person who acts at the request of and as an agent of a purchaser of drugs may not be convicted of the charge of selling drugs *(People v Lindsey,* 16 AD2d 805, affd 12 NY2d 958). Further, where the charges stem from a sale of narcotics, a conviction for possession with intent to sell, as here, would be similarly infirm *(People v Lindsey, supra).* As to Freed, there is no evidence in the record that he was involved in any narcotics enterprise or that there was a prior course of dealing between him and Papa or Johnston. Freed did tell Detective Spinelli that

---

whitish-tannish powder, as expected, but rather "black and gummy" and "four God-dammed baggies", instead of one single plastic bag. The dispute as to the quantity of the substance sold arose out of evidence that defendants allegedly came up with over a pound of drugs only at the last moment and that one of the undercover officers involved in the sale, Caggiano, was then under investigation for having "whacked up" another narcotic sale, by diluting a small amount of drugs, to achieve class A status.

Johnston was his drug connection when Spinelli first suggested that they could make a lot of money if drugs could be obtained; but, in the absence of any suspicion, much less evidence, that Freed was a user or seller, his statement to Spinelli does not preclude the existence of an issue of fact. Moreover, Freed received a "brokerage" fee from Detective Spinelli, which was handed him in the car in Johnston's absence during the sale, and it clearly appears that Freed did not share in the $13,400 given Papa for the drugs. As to Johnston, he, too, received a "brokerage" fee from Detective Spinelli and, apparently, retained no part of the $13,400 given Papa. Indeed, there is even evidence that he shared his "brokerage" fee with Papa, from whom he allegedly had secured the narcotics and who was actually present at the scene of the buy. However, contrary to the case as against Freed, there exists some evidence of prior narcotics dealings by Johnston, although it points to him as a user rather than a seller, and, by the same token, some evidence that Johnston, but not Freed, would apparently just as soon have withdrawn from the deal when problems arose. We do not believe that defendants established their agency as a matter of law, but an issue of fact in that regard meriting jury consideration was certainly raised (see, e.g., *People v Lindsey, supra; People v Wright,* 20 AD2d 652). It is also manifest, upon this record, that the statements, conduct and inexperience of the prosecutor deprived defendants of a fair trial. In particular, the prosecutor too often flouted the rules of evidence. Thus, for example, he frequently prompted his witnesses with leading questions, signalled the answers he wanted and made faces; he conveyed the impression that the trial court was frustrating his attempts to put all the evidence before the jury; and he, seemingly deliberately, elicited obviously prejudicial matter. He also repeatedly implied that defense counsel's questioning of his witnesses was improper and his attitude toward defense counsel was sarcastic and demeaning. In his summation the prosecutor implied that Freed and Johnston had somehow been involved in the death of the young addict, Tommy Bambrick, a statement which he later retracted; he accused defense counsel of having slandered, ridiculed and criticized Silverman, which he subsequently retracted by a statement that he did not think counsel had been unprofessional and that they had "done a great job, particularly considering the material they had to work with"; and he repeated matter, involving the witness Caggiano, to which an objection had been sustained, implying that the ruling was improper and totally distorting the facts. In addition, the prosecutor frequently stated that various of the police officers had given honest testimony and told the truth; that by reason of the evidence and certain tape recordings defense counsel could not claim mistaken identity or that the crime had not happened and, feeling they had to say something, said their clients had been entrapped; that the jury could sit in court for a hundred cases and never again hear anything so devastating as these tapes; and that Freed and Johnston had to prove, as part of their entrapment defense, that they were "decent human beings". Finally, the prosecutor concluded with an inflammatory "fire and brimstone" speech, in which he personally aligned himself with the jury and the forces of good against defendants and the forces of evil, and argued that cocaine was a "poison" which destroys "minds and bodies and lives" and that defendants were committing "slow, mass murder". Finally, we disapprove of the practice of the police in this case in destroying or reusing allegedly inaudible tapes of Kel transmissions. Whether or not such tapes are, in fact, audible is a determination to be made by the court and, to that end, the police are required to preserve such evidence. They should not, as here, unilaterally determine, even in good faith, that the evidence need not be preserved because, in their opinion, it is useless. Latham, Acting P. J., Cohalan, Christ,

Munder and Shapiro, JJ., concur.

