THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ALAN HOCHBERG, Appellant.

Third Department, April 13, 1978

**APPEARANCES OF COUNSEL**

*Goldberger, Feldman & Breitbart (Joel A. Brenner* of counsel), for appellant.

*Arthur Weinstein* for respondent.

OPINION OF THE COURT

MIKOLL, J.

The People charged that the defendant, Assemblyman Alan Hochberg, met with one, Charles Rosen, in January and February, 1976, to secure Rosen's promise not to run against him in the 1976 primary for the Assembly in exchange for Hochberg's promise to give Rosen a $20,000 a year job in the Legislature, a session job for Rosen's brother-in-law paying approximately $3,000, and a $5,000 political campaign contribution. The defense contended that Hochberg's discussions with Rosen were for the purpose of establishing a working political coalition between Rosen, the political group in Co-op City which evolved during the rent strike and defendant's group in Pelham Park, as well as filling positions on his legislative staff with qualified persons.

The defendant was convicted of violating subdivision 5 of section 421 of the Election Law (Penal Law, § 110.00) which prohibits the fraudulent or wrongful doing of any act tending to affect the result of a primary election; section 448 of the Election Law which prohibits any person, while holding public office, from corruptly using or promising to use his official authority to secure public employment upon consideration that the person so to be benefited or any other person will give or use their political influence or action in behalf of any candidate, or upon any other corrupt condition or consideration; and section 77 of the Public Officers Law which makes it a felony for any member of the Legislature to ask, receive, consent or agree to receive "any money, property or thing of value or of personal advantage" for performing any discretionary act which he may exercise by virtue of his office. The jury acquitted defendant of a fourth charge of violating sections 110.00 and 155.35 of the Penal Law, attempted grand larceny in the second degree.

The People's evidence established that defendant was the State Assemblyman from the heavily Democratic 81st Assembly District (A.D.) located in The Bronx, New York. He was to be a candidate for re-election in the 1976 elections for the term of office commencing January 1, 1977. The district was divided into two sections, 81st A.D. West, which consisted of an area known as Pelham Parkway where defendant resided and which area he controlled and 81st A.D. East, known as Co-op City, a large housing development community of about 60,000 people, where, Charles Rosen, chairman of steering

committee III, was the very popular leader of a rent strike supported by 86% of the residents. Co-op City was 99% Democratic in party affiliation and comprised about 40% of the Democratic primary vote in the district. Pelham Parkway supplied about 60% of that vote. Success in the Democratic primary was tantamount to election in the 81st A.D.

In the early summer of 1975, it had been discovered that New York City Councilman, Stephen Kaufman, had deceived the residents of Co-op City by his duplicitous conduct involving the rent strike. He was the only elected public official living in Co-op City but he became unelectable because of his rent strike duplicity. His actions were defended by the regular Democratic Club leadership in the district who were, at best, considered lukewarm in their support of the rent strike. There were regular and reform factions splitting the democratic support outside of Co-op City in the summer, fall and early winter months of 1975-1976.

Larry Dolnick, a vice-chairman of steering committee III, and Elliot Engel were leaders of the New Democratic Club formed in the 81st A.D. East. This club included both reform Democrats and regulars who were dissatisfied with the regular Democratic Club. According to Dolnick, the defendant first approached him and Engel with offers of defendant's support. He indicated to Dolnick that he wanted to run for Civil Court Judge in 1977, that his Assembly seat would then be open and that he would introduce Dolnick into the Pelham Park area so that he could take over his position as Assemblyman. When Dolnick told defendant he was not interested in public office, defendant offered him a job on his staff at a salary of $19,000-$20,000. Dolnick said he could not take such a job because of his association with the rent struggle. The Assemblyman then offered him a job for a lesser amount of money with the Legislature where "he wouldn't have to appear." Dolnick further said that in connection with the upcoming 81st District leadership race, at which either he or Elliot Engel would be the candidate, defendant offered to contribute $750 to that campaign.

Defendant told Dolnick that he did not want a primary in 1976 because it would be expensive. On different occasions he inquired of Dolnick whether Charles Rosen intended to run against him. Dolnick said Rosen did not. However, defendant said he wanted to hear it from "the horse's mouth" and wanted Dolnick to set up a meeting. He stated that Rosen

would be a viable candidate, that a primary campaign for the Assembly would cost upwards of $25,000 and that he wanted to run for Civil Judge in 1977 and that that was the reason he wanted to be sure Rosen would not run. Dolnick thereafter advised Rosen that the defendant wanted to talk to him and told Rosen of the offers the defendant had made to him.

Charles Rosen testified that he visited the office of the Special Prosecutor for Nursing Homes in December, 1975, to discuss defendant's connection with the nursing home industry. He mentioned what he characterized as defendant's "third party bribe" offer and the Special Prosecutor subsequently suggested that Rosen meet with the defendant to allow him to repeat the "bribe."

On January 27, 1976, Dolnick and Rosen went to the Special Prosecutor's office and arrangements were made to record the meeting defendant requested. The first tape recording played at trial revealed that Dolnick, Rosen and defendant met at Dolnick's apartment on January 30, 1976, where defendant stated he did not want a primary in 1976, that he wanted to run for the Bench in 1977 and that he wanted their support for that office. The discussion included references to defendant's job offer to Dolnick and his proposed $750 contribution for the New Democratic Club campaign. At this meeting defendant stated that he was willing to help Rosen achieve his dreams because the $25,000 he would probably have to spend in a tough primary against Rosen would kill his judgeship race. Defendant stated that he would not have the resources for two campaigns. Defendant offered the $20,000 job on his staff to Rosen but said they would have to work it out with Dolnick first because he had offered the same job to him. Defendant also said he would raise $5,000 for Rosen's 1978 special election campaign for the Assembly by recommending that other people contribute to Rosen's campaign fund.

On February 5, 1976, Rosen and the defendant met alone at the Larchmont Diner. The tape recording of this meeting disclosed that defendant offered to place Rosen in a $3,000 job on his committee at the current session. It was agreed Rosen could not take it, but that any name would be acceptable to defendant as a "stand-in" for Rosen. That conversation went like this:

"ROSEN: Now, you talked about this job on your committee. I can't take that job.

"HOCHBERG: Who can? Is that a thought?

"ROSEN: That somebody would be a stand-in.

"HOCHBERG: Right. Does it look bad if your wife?

"ROSEN: What about my sister-in-law * * * or my brother-in-law * * *

"HOCHBERG: Matter of fact * * * as I told you, as of Monday, at least for the figure I had quoted you they can * * * come up and sign on. Immediately * * *

"ROSEN: So who will know.

"HOCHBERG: That's right. All right. Thats. That's that."

Defendant further stated in the taped conversation that he could guarantee Rosen $5,000 for his special election campaign and that the $3,000 session job was evidence of his good faith in that it would be completely paid before the primary. Rosen testified that in addition defendant said, "I will give you—" and then proceeded to write on a napkin the figure $5,000, asking him to nod if it was acceptable.

He also said that if the rent strike was not over, Rosen's stand-in could be placed in the $20,000 job. When Rosen asked defendant not to put the stand-in's name on the payroll until Wednesday instead of the Monday, as planned, the defendant made reference to the stand-in losing. Rosen replied, "Schmuck, he's losing nothing, I'm getting the money." Defendant agreed, "But that's it, you're losing, why * * *?" Rosen explained he had to talk the matter over with his wife.

At a subsequent recorded meeting on February 8, 1976, Rosen advised the defendant that the "stand-in" would be in Albany the following day. Rosen asked him when the arrangement regarding the $5,000 contribution which he had written on the napkin would be consummated. Defendant said that he had an, "excellent mechanism to protect both of us." Rosen could set up a bank account in the name of a campaign committee and contributions could be made to that entity by defendant. "No problems, it's perfectly legal." he assured Rosen.

The stand-in for Rosen, his brother-in-law, Chris Johnson, who was equipped with a recording device, arrived in Albany the next day and defendant accompanied him to the necessary offices so that he could be put on the payroll. Defendant told Johnson that he would not have to come to Albany again but he would like Johnson to answer some mail at home.

The defense, through cross-examination of Rosen, and the

testimony of defense witness, Philip Luce, sought to establish that Rosen was biased against defendant in that Rosen was a militant communist, out to destroy the Government of the United States and in the process to destroy Assemblyman Hochberg as a political force in the community. At the same time, through cross-examination of Dolnick and Rosen, the defense attempted to show that the discussions with Rosen were merely political in nature, made to establish a political coalition in the 81st Assembly District. The defendant also attempted to develop a basis for the defense of entrapment through cross-examination and the establishment of bias on the part of Rosen towards defendant. In addition, the defense offered the testimony of several character witnesses.

Defendant on this appeal first contends that there was a failure to prove beyond a reasonable doubt that the offers made by defendant were contingent on Rosen not running in the primary since they were made as part of a larger political accommodation involving the 81st Assembly District. We disagree. While certainly on this record a question of fact was created for the jury, there was sufficient evidence for the jury to find that the job offers were made on the condition that Rosen not run in the primary. Defendant said he did not want a primary against Rosen, that it would cost him $25,000 and would "kill his judgeship race," because he would not then have the financial resources for such a race. Defendant's knowledge that the offers were made contingent upon Rosen's not running in the primary appears from his statement in reference to the offer of the $3,000 session job, that: "That's my good faith * * * it is completely paid * * * before the petitions are filed." Further, the fact that the $20,000 and the $3,000 staff jobs were offered by defendant without regard to the duties to be performed or the skills required indicated the presence of an ulterior motive. Defendant's reference to their "agreement," their "deal" and "personal *quid pro quo*" during both meetings with Rosen, in connection with their discussions, along with his caution to Rosen to "deny everything" is sufficient to establish that defendant attempted to condition the job offers on Rosen's promise not to run in the primary.

It is also urged by defendant that the People failed to prove that he accepted "a thing of value or personal advantage." This is without merit. Unlawful fees and payments (Public Officers Law, § 77) are obviously a form of bribery. The benefit accruing to the public official need not be tangible or

monetary to constitute a bribe *(People v Hyde,* 156 App Div 618; *People ex rel. Dickinson v Van de Carr,* 87 App Div. 386). Here, Rosen's agreement not to run in the 1976 primary was a sufficiently direct benefit to the defendant to be included within the term "thing of personal advantage."

█ Defendant next claims that there was a failure to prove that he acted with a wrongful intent because the People failed to prove that he knew he was violating subdivision 5 of section 421 and subdivision 1 of section 448 of the Election Law. We find this contention is without merit. There are sufficient facts in the record from which the jury could find that defendant acted with a corrupt intent *(People v Lang,* 36 NY2d 366, 370-371; cf. *People v Shapiro,* 4 NY2d 597, 600). The trial court charged that a corrupt intent involved "an intentional and knowing disregard of the law." "Intentional" requires a conscious objective to engage in the prohibited conduct while "knowing" requires an awareness that one's conduct is of such nature or that such circumstances exist (Penal Law, § 15.05, subds 1 and 2). Here, evidence existed that defendant used or promised to use his authority as a legislator to secure staff jobs for Rosen and Johnson with the intent and purpose of obtaining Rosen's promise to refrain from entering the primary in violation of subdivision 1 of section 448 of the Election Law. Likewise, evidence existed that defendant deliberately attempted to cause Rosen to refrain from entering the primary in exchange for the said jobs and offers of campaign contributions in violation of subdivision 5 of section 421 of the Election Law.

Defendant urges that, at best, the evidence only supports attempted unlawful fees and payments and attempted corrupt use of position or authority, in that, Rosen testified that he never intended to run in the primary. The argument must be rejected since both crimes encompass an attempt. Unlawful fees and payments require only the mere asking, consenting or agreeing to receive anything of value or personal advantage in exchange for performing a discretionary act. Corrupt use of position or authority includes only corruptly *promising* to use official authority in exchange for a promise not to enter the primary.

Further, defendant argues that because Rosen said he never had the intention to run in the primary, there could be no actual *effect* on the primary, as required by subdivision 1 of section 448 of the Election Law, and that likewise, Rosen's

promise not to run in the primary was not a thing of value as required under section 77 of the Public Officers Law. This argument is defeated by the fact that Rosen's state of mind was a present but transient state of mind at the time, subject to change and unbound by the obligations inherent in a promise not to run. Such a promise would take away his unfettered freedom to be a candidate and change the transitory nature of his state of mind to permanency. Thus, the promise not to run affected the primary by removing Rosen as a viable potential primary candidate and, also, consequently, was a thing of value or personal advantage to defendant.

■ Defendant contends that the statutes under which he was convicted are (1) unconstitutional in that they are overbroad and inhibit First Amendment activities relative to free political discussion; and (2) unconstitutionally vague in prohibiting the use of official position or authority in exchange for the benefit of another's "political influence or action" or "upon any other corrupt condition or consideration." We find the first contention is without merit. The statutes place reasonable restrictions on the use of official position and authority which is corruptive of a free elective process. No one has a constitutional right to corruptly use official position or authority to obtain political gain. Secondly, the statutes here under attack are sufficiently definite to give a reasonable person notice of the nature of the acts prohibited. They are generally aimed at corrupt bargaining to obtain public office and specifically at the use of the public payroll in such bargains. In view of the myriad ways in which the object sought to be prohibited may be accomplished, laws framed with narrow particularity would afford easy circumvention of their purpose and be ineffectual. Thus, the statutes are neither impermissibly vague nor overbroad *(People v Lang,* 36 NY2d 366; *People v Willett,* 213 NY 368). A person of ordinary intelligence would realize that it is illegal to offer Assembly staff positions to another as a payoff not to run against him in an election for public office.

■ Defendant next urges reversal of his conviction on the ground that the evidence established the defense of entrapment as a matter of law. We disagree. Under section 40.05 of the Penal Law, the affirmative defense of entrapment can be made out only when the "active inducement or encouragement" of a public servant or of a person acting in co-operation with a public servant creates "a substantial risk that the offense would be committed by a person not otherwise dis-

posed to commit it." Defendant had the burden of proving such defense by a preponderance of the evidence *(People v Laietta,* 30 NY2d 68, cert den 407 US 923). We conclude that the jury properly found that defendant did not meet that burden.

The job offers originally made to Dolnick and defendant's offer of the same job to Rosen, without significant pressure from Rosen, confirmed on the tape recording of the January 30, 1976 meeting at Dolnick's apartment, permitted the jury to find defendant had a predisposition to commit the crimes in question.

■ Defendant raises the argument that the evidence secured through the investigation of the Special Prosecutor, conducted prior to the authorization by the Governor's superceder order, was gathered without legal authority, in violation of defendant's constitutional rights, and thus, was inadmissible upon the trial of the resulting indictment. We reject this contention. The tape-recorded evidence presented to the Special Grand Jury and at trial was obtained without violation of defendant's rights. Rosen and Dolnick were participants in their conversations with defendant and therefore had a legal right to record the conversations in question. They violated no rights of the defendant in doing so. The Special Prosecutor for Nursing Homes acted beyond his jurisdiction in conducting the investigation prior to the issuance of Executive Order 31 (9 NYCRR 3.31), authorizing the creation of the Special Grand Jury. However, the evidence so gathered for that reason alone, is not subject to the exclusionary rule established by *Mapp v Ohio* (367 US 643) and *Wong Sun v United States* (371 US 471) and it was therefore properly received at trial *(Matter of Nigrone v Murtagh,* 46 AD2d 343).

Defendant contends that he was deprived of a fair trial through prosecutorial misconduct during the trial and in summation. Although there was some petty bickering between counsel which resulted in some uncalled for remarks, on the whole, in this lengthy and difficult trial, the court made proper evidentiary rulings and gave proper cautionary instructions to the jury when called upon by counsel *(People v Broady,* 5 NY2d 500). No objection was made to the remarks the defendant contends were inflammatory at the trial. Some of these remarks, we agree, were improper; however, in relation to the entire summation, the asserted error does not require this court to exercise its discretion to reverse in the

interests of justice *(People v Shields,* 58 AD2d 94). Considering the entire summation and the court's instructions as a whole, we perceive no reversible error *(People v Broady, supra; People v Marks,* 6 NY2d 67).

Defendant urges that the trial court committed error in charging the jury that if the jury found that a preponderance of the evidence did not establish entrapment that they must go on and "consider the other issues in the case." He contends this was a reversal of the proper order in which the jury should have considered the proof and relies heavily on *People v Johnston* (47 AD2d 897). However, we do not find *Johnston* controlling here. In *Johnston,* the appellate court found fundamental error in that the trial court had asserted the guilt of the defendants as a fact, thus relieving the prosecution of its burden of proving their guilt beyond a reasonable doubt and allowing the defendants an opportunity of acquittal only if they proved their defense of entrapment. The charge of the trial court here did not go so far and we do not find that it was fatal error for the trial court on this record to suggest to the jury that they may consider the defense of entrapment first before considering other issues in the case. It should be noted, that in view of the fact that this specific objection was not made by counsel for defendant and that an instruction agreed upon by counsel was read to the jury, this issue, as raised on appeal, was not preserved for our review as a matter of law.

Defendant argues that reversible error occurred when the trial court ruled that it would not charge subparagraphs (c) and (d) of Count 1 of the indictment because as a matter of law they did not constitute elements of the crime of corrupt use of position or authority since the contents of (c) and (d) did not constitute the use of official power. Subparagraph (c) of Count 1 alleged that the defendant committed the crime of corrupt use of position or authority in that he promised to resign his Assembly seat in 1977 and support Rosen in the special election in 1978 and make a $5,000 contribution to that campaign. Subparagraph (d) alleged the commission of such crime in that defendant promised to use his influence to help Rosen establish a political base. Defense counsel in objecting, argued that by omitting (c) and (d), the theory of the case was changed, since the defense could then no longer rely upon the failure to prove either element alleged in (c) or (d) for an acquittal of that count of the indictment. The trial

court found that since the allegations of (c) and (d) were not elements of the crime charged, they were mere surplusage. We agree *(People v Laurence,* 137 NY 517), and we conclude as well that the theory of the indictment was not altered by the deletion.

■ Finally, defendant requests a modification of the sentence on the grounds it is harsh and excessive. Sentencing is a matter resting within the sound discretion of the trial court and the sentence imposed should not be reduced on appeal unless there is an abuse of that discretion *(People v Dittmar,* 41 AD2d 788; *People v Caputo,* 13 AD2d 861). Here, the trial court considered the facts and all other relevant material before pronouncing sentence. We cannot say that it was excessive.

The judgment should be affirmed.

GREENBLOTT, J. P., LARKIN and HERLIHY, JJ., concur; KANE, J., concurs in the result only.

Judgment affirmed.