Nelson C. RISING, John V. Tunney, and Friends of John V. Tunney, South, Inc., a California non-profit corporation, Plaintiffs,

v.

George E. BROWN, Jr., and Robert Jeans, Defendants.

No. 70–1123.

United States District Court, C. D. California.

June 1, 1970.

Howard I. Friedman, Paul G. Bower, David A. Cathcart, Thomas E. Gallagher, Los Angeles, Cal., for plaintiffs.

William Matthew Byrne, U. S. Atty., Los Angeles, Cal., James R. Dooley, Asst. U. S. Atty., for Postal Office.

George E. Bodle, James H. Webster, Julius Reich, Los Angeles, Cal., for defendants.

## REVISED ORDER GRANTING PRELIMINARY INJUNCTION

DAVID W. WILLIAMS, District Judge.

For the reasons explained in the first paragraph of this Court's order prepared and filed on May 27, 1970, that order is now withdrawn and this revised order is to take its place. There is no change in the end result.

Plaintiff John V. Tunney and defendant George E. Brown, Jr. are congressmen from near adjoining districts in California. Both legislators are candidates for the United States Senate in the primary election set for June 2, 1970. The remaining plaintiffs are campaign aides of John V. Tunney and the remaining defendant is a campaign aide of George E. Brown, Jr. Plaintiffs obtained a temporary restraining order enjoining the defendant George E. Brown, Jr. or his campaign aides from using that congressman's franking privilege to mail a piece of literature to voters which the plaintiffs contend is campaign material. The incumbent United States Senator and at least two other persons who do not possess the franking privilege are also major candidates.

This Court has jurisdiction over the controversy under 28 U.S.C. § 1339 which provides:

"The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to the postal service."

The franking privilege is governed by acts regulating the postal service. Public Law 86–682, 74 Stat. 578.

Title 39 U.S.C. § 4161(2) provides in part that:

"* * * members * * * of Congress * * * may send as franked mail * * * correspondence * * * upon official business to any person. * * *"

Title 39 U.S.C. § 4163 provides that:

"Members of Congress may send as franked mail the Congressional Record, or any part thereof, or speeches or reports therein contained."

It was agreed between the parties that 300,000 pieces of the questioned mailout were printed. It was entitled, Congressman George Brown—Report From Washington, May, 1970." This was preceded by a franked post card mailed by Mr. Brown to persons residing throughout California in January, 1970 which said in part:

"Dear Concerned Citizen:

I am asking you, a resident of California to participate in this survey. As a member of the Science and Astronautics Committee of the United States Congress, I am interested in your opinions of these questions. This spring, our committee will be holding hearings in California on environmental pollution. I would very much appreciate the opportunity to present your views to the committee. The data collected will be made available to all California congressmen, other elected officials and the press.

Sincerely yours,

George Brown,
Member of Congress"

The reverse side of this card contained 9 questions and gave the recipient the opportunity of checking a "Yes" box or a "No" box and invited him to return the questionnaire to the office of Mr. Brown. The use of the frank to send the January post card is not questioned by the plaintiffs.

Mr. Brown contends that the post card brought him many replies and that the piece of literature here being assailed was his way of keeping those persons informed of the results of the survey he undertook. He claims that the January questionnaire was sent out as a part of his activities as a member of the House Science and Astronautics Committee which was investigating air pollution problems and was considering the creation of a federal agency to regulate en-

vironmental quality, off-shore oil drilling and undeveloped open spaces.

■ Defendants claim that plaintiffs have no standing to sue and have no interest in the postal revenues or the administration of the postal laws except as members of the general public. They rely upon Massachusetts v. Mellon, Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) for the proposition that the interest of a taxpayer in the monies of the treasury does not provide standing to sue for alleged improper expenditures of public funds. However, through the years, the stringent requirements of the *Mellon* case have slowly been eroded and exceptions and new characterizations of the rule have evolved.[1]

In Baker v. Carr,[2] the Supreme Court announced that a party has standing to maintain a Federal Court action to challenge the validity of the statute if he alleges:

"(S)uch a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." (369 U.S. at 204, 82 S.Ct. at 703).

As stated by plaintiffs in their reply brief:

" * * * the question plaintiffs present to this Court is whether Congressman Brown shall be required to place a 6¢ stamp upon each envelope containing the literature attached as Exhibit C to the complaint in this action, or containing any similar literature, before that envelope is carried to California voters by the Post Office Department. The issue is not speculative; it presents a specific controversy; it involved the question whether tax dollars shall be reimbursed

to the post office by the Congress of the United States for an illegal use of the franking privilege; and it raises the disturbing possibility that the primary campaign of a major political party is being influenced by misuse of public funds."

It is clear that plaintiff Tunney has such a personal stake in the outcome of the upcoming primary election wherein he and defendant Brown are rivals as to assure "concrete adverseness" within the meaning of Baker v. Carr.

■ Turning now to the merits of the controversy, it is defendants' contention that the brochure is entitled to be mailed with use of the franking privilege because it is official business within the meaning of 39 U.S.C. § 4161(2). The unfolded document displays 8 panels, a portion of which does indeed devote itself to a discussion of the work of the subcommittee and is concerned with environmental problems, but at least 50% of it is devoted to other matters which strongly lends itself to the suspicion that it is promotive of getting votes for the sender. It carries a total of 6 photographs of Mr. Brown in various speaking poses. On full panel is devoted to the congressman's views on Cambodia and urges that we withdraw American troops from the entire Southeast Asia area as rapidly as possible. Another panel lists "Congressman George Brown's Five Years of Voting 'No' On The War." During his campaign for the Senate the defendant has directed his appeal to the opponents of the existing United States policy in Vietnam and he has taken a strong anti-war position. His sudden departure in his brochure from the environmental interest of his subcommittee to his views on the war suggests a dual purpose. Moreover, it is significant that the 300,000 copies were paid for by Mr. Brown, prepared by the public relations firm which is managing his Senate cam-

---

1. *e. g.*, Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) ; Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691 (1962) ; Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946) ; Smiley v. Holm, 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795 (1932).

2. 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)

paign, was printed in Los Angeles and stuffed in envelopes by volunteer campaign workers in various campaign headquarters and in homes. Also of critical importance to this Court is the fact that he chose to wait until two weeks before election day to begin mailing the material and it was not confined to persons within his congressional district but sent throughout the State of California. Plaintiffs also presented evidence that many of the pieces were mailed to persons who never received the January post card. These facts support the claim that the material is not "official business" but is more closely related to campaign material.

In Post Office Department Publication #126 (April, 1968) entitled "The Congressional Franking Privilege" that department discussed what it felt was a proper use of the franking privilege:

> "Correspondence on 'Official Business' is that in which the member deals with the addressee as a citizen of the United States or constituent, as opposed to the relationship of personal friend, the relationship of candidate or prospective candidate and voter, or when the member writes in the capacity of a member of a political party or faction."

It went on to say:

> "Appeals for political support, references to what a member expects to do in the next Congress sent out before an election, discussion of a prior political campaign, discussion of a coming political campaign and reference to campaign opponents as such are all matters beyond the official business concept." [3]

Defendants further contend that even if the mail-out is not "official business" within the meaning of § 4161, it is protected by § 4163 because the pamphlet is part of the Congressional Record. Evidence presented at the hearing indicated that on the day following the issuance of the temporary restraining order in this case Congressman Brown caused the text of the mail-out to be inserted in the Congressional Record. Defendants rely on Straus v. Gilbert, 293 F.Supp. 214 (S.D.N.Y.1968) which states that § 4163 does not prohibit a congressman's use of the frank on material reprinted from the Congressional Record even if it were mailed for campaign purposes. The facts of the case disclose that an incumbent congressman, in his bid for reelection, caused to be reprinted portions of his past statements in the Congressional Record and mailed it along with a covering letter to members of his newly reapportioned congressional district. This Court is not bound by that decision but it seems readily distinguishable from the case at bar. Here, the defendant caused the pamphlet to become part of the Congressional Record one day after this Court had granted a temporary restraining order and after many thousands of the brochure had already been mailed with use of the franking privilege. I do not believe that § 4163 can be interpreted as to eliminate all protections against the abuse of the frank, else a congressman could cause undisputed campaign material to be inserted into the Congressional Record for the sole purpose of allowing him to disseminate it among the people of his district or state by using the franking privilege. In in-

3. The publication of these guidelines must have caused some members of the Congress to criticize the Post Office Department because on December 26, 1968, Timothy J. May, its General Counsel, addressed a letter to Congressmen covering a newly issued statement of policy which explained that the department was not going to lend itself to possible censorship of congressional mail and that the "use of the franking privilege for correspondence on official business is a matter strictly between the member of Congress and his conscience." "Under these circumstances," Mr. May continued, "we therefore feel that we can provide advisory guidelines to the officials possessing a franking privilege, but that they themselves should have the responsibility for policing themselves."

Thus it seems that the Post Office Department has in no way withdrawn its earlier criteria but has adopted an understandable "hands off" policy rather than tangle with possessors of the privilege.

stances where persons possessing the franking privilege were running for public office against persons not possessing this privilege, the former would be given a distinct and unfair advantage.

There is an understandable unwillingness on the part of the judiciary to become involved in disputes of a purely political nature, especially at election time, but the public has an overriding interest in being protected against abuses of the franking privilege especially where, as here, the size of the mailing is so large.[4] There is a showing of irreparable damage to plaintiff Tunney and a preliminary injunction is ordered enjoining the defendants pending trial of this action, from mailing or allowing to be mailed any additional of the folders exhibited to this Court by using the franking privilege.

Plaintiffs are required to prepare and lodge proposed findings not later than June 12, 1970.

---

4. The cost to the taxpayers of franked mail in 1966 and the consequent ramifications to the taxpayer can be seen from the following example given in a recent Law Review article. "—The total cost of franked mail was $7,682,000.00; total revenue, paid by lump sum appropriation to the legislative branch for that purpose was $7,248,000.00 and $164,000.00 was appropriated as a public service cost * * * leaving a deficit caused by under appropriation." Project, 41 S.Cal.L. Rev. 643, 657 at n. 115. (1968).