■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v VINCENT A. RICCIO, Appellant. — Appeal from a judgment of the Supreme Court at Trial Term (Walsh, Jr., J.), entered June 11, 1981 in Albany County, upon a verdict convicting defendant of the crimes of grand larceny in the second degree, conspiracy in the third degree, and conspiracy in the fifth degree. The People charged that commencing in August, 1975 and continuing through April, 1979, while acting as vice-chairman for the New York State Temporary Commission on Child Welfare, defendant placed individuals on the commission payroll with the intent to deprive the State of New York of property and to appropriate the same to himself and to his paramour Natalie Kachougian; that the misappropriation was agreed to by the parties involved and defendant knew and intended that the individuals placed on the payroll would not perform any work to earn money paid to them; and that defendant and the others agreed to testify falsely before the Grand Jury on matters material to

the investigation. Following a six-week trial, defendant was acquitted of 9 of 12 counts of the indictment, but convicted of grand larceny and two counts of conspiracy, all relating to the placement of one Paparian on the payroll. Defendant urges that the evidence was insufficient as a matter of law to support his grand larceny conviction. We disagree. Testimony by D'Emic, Paparian and Guerrara, those successively placed on the payroll, clearly established the scheme employed by defendant. Since the jury found a reasonable doubt as to whether D'Emic and Guerrara performed any work for the commission, defendant was acquitted on the counts specifically relating to them. Paparian, on the other hand, testified that she never did any work for the money received. While defendant testified he "sort of told [Paparian] what to do", he also conceded that he never talked to her concerning her duties and admitted he neither gave her any assignments nor received any material from her. It is also clear Paparian gave all the funds she received to Kachougian. In effect, there was sufficient evidence for a jury to conclude that Paparian was placed on the payroll not in anticipation of performing work, but to serve as a conduit through which State funds could be stolen on behalf of defendant and Kachougian. The evidence further supports the jury verdict that it was defendant who placed Paparian on the payroll, not the committee chairman. Having set in motion the events leading to Paparian's placement with no intent that she actually work, defendant is responsible for the direct result (*People v Hochberg,* 87 Misc 2d 1024, affd 62 AD2d 239, mot for lv to app den 44 NY2d 953). We further find that the Deputy Attorney-General's appearance before the Grand Jury was authorized pursuant to Executive Order No. 78 signed by the Governor on December 20, 1978 (9 NYCRR 3.78).[1] That order, in effect, permitted the Attorney-General, by his assistants or deputies, to appear before a specially empanelled Grand Jury in Albany County to investigate matters dealing with an investigation pending in the Office of the Special State Prosecutor for Nursing Homes, Health and Social Services (see *Matter of Additional Jan. 1979 Grand Jury of Albany Supreme Ct. v Doe,* 50 NY2d 14). We reject defendant's argument that the Special Prosecutor exceeded this authority since the investigation of defendant was not within the scope of Executive Order No. 78. By issuing the superceder order, the Governor was acting on information that "various crimes may have been committed by public officials in Albany County" (*id.,* at p 16). Defendant misconstrues the nature of this order by asserting that the investigation dealt with "a particular State Senator" and thus could not extend to him. Defendant's contentions are not supported by the record and it is clear that the order conferred broad authority to prosecute "any person" for "any and all unlawful acts" arising out

1. In July of 1979, defendant learned that his employment practices as vice-chairman were being investigated. Defendant commenced a proceeding for a writ of prohibition pursuant to CPLR article 78 to enjoin the investigation on the ground it was outside the scope of authority granted under Executive Order No. 78. Special Term (Harvey, J.) dismissed the application after an *in camera* examination of the Grand Jury proceedings. The decision and the record of the *in camera* proceedings were sealed and ordered preserved for appellate review. By decision dated July 30, 1981, this court affirmed the determination, finding that since the investigation had been completed and defendant indicted, tried and convicted, the relief sought was moot (*Matter of Brown v Abrams,* 83 AD2d 740, 741). We noted, however, that defendant's challenge to the Special Prosecutor's authority was preserved in the record for appellate review in the ordinary course of defendant's appeal from the judgment of conviction. By order of this court dated May 13, 1982, defendant's motion for an order unsealing the *Matter of Brown* record for purposes of this appeal was denied.

of the original allegations.[2] Moreover, there is evidence in the record that defendant initially claimed to be acting with the Senator's approval in putting no-shows on the payroll. Even assuming that the Senator, not defendant, was the "subject" of the investigation, the Grand Jury was responsible to fully explore the possibility of joint abuse of the commission payroll. Thus, the Deputy Attorney-General's appearance before the Grand Jury was authorized. Nor do we find error in the trial court's refusal to suppress statements made by defendant to Investigators Lydon and Iannuccilli after his arraignment. The suppression record shows that defendant, while going from the courthouse to a police car, was crying, and that Lydon commented "[T]here comes a time every man must stand up for himself". Defendant did not respond, but proceeded down the courthouse steps and across the street. Upon reaching the car, defendant stated "You know you guys have got the wrong fellow * * *. My whole career has gone down the drain and the sad part of it is I didn't get a dime. I did it for someone else". At the police station, defendant again stated to Lydon that they had the "wrong guy". Based on this testimony, the suppression court properly determined that the statements made by defendant were spontaneous and not induced by Lydon's initial comment. We find the challenged declarations to have been spontaneous and in no way induced, provoked, triggered, or encouraged by the police and properly admitted into evidence (*People v Rivers,* 56 NY2d 476; *People v Lynes,* 49 NY2d 286). The initial comment made by Lydon was not an attempt "to evoke a declaration from the defendant" (*People v Lynes, supra,* p 295), but appears to have been made to calm defendant who was emotionally distraught. Moreover, the response was neither immediate nor related to Lydon's comment. Defendant's repetition of the "wrong guy" remark at the police station was clearly unsolicited. Under these circumstances, the motion to suppress was properly denied. We have considered defendant's remaining arguments and find them without merit. The amendment to the sixth count of the indictment did not alter the theory underlying the People's case, and was within the contemplation of CPL 200.70. Defendant neither qualified for, nor were his actions protected under the "Speech and Debate" clause of section 11 of article III of the State Constitution (see *United States v Brewster,* 408 US 501, 515-516). Finally, the sentence imposed was neither harsh nor excessive. The court fully considered all relevant factors by imposing a sentence well within the statutory guidelines (Penal Law, § 70.00, subd 2). We find no abuse of the discretion vested in the sentencing court (*People v Hochberg,* 62 AD2d 239, 251, mot for lv to app den 44 NY2d 953, *supra; People v Dittmar,* 41 AD2d 788). Judgment affirmed. Sweeney, J. P., Mikoll, Yesawich, Jr., and Weiss, JJ., concur.

---

2. Contrary to defendant's arguments in his brief, this court's order of May 13, 1982, denying his motion to unseal the *Matter of Brown* record, in no way prevented him from coming forward anew with evidentiary proof to support his jurisdictional objections.