Simons, J.
(dissenting in part). I agree with the majority *55 that the counts of the indictment founded on defendants’ use of their regular employees for political activities in addition to legislative duties must be dismissed (Categories 1 and 2). I also agree that the counts of the indictment charging defendants with certifying the salary of four "no-shows”, persons placed on the legislative payroll who performed no duties, should stand (Category 4). I disagree, however, with the dismissal of the charges alleging that defendants unlawfully authorized payment from State funds to persons whose only duties consisted of working for Democratic senatorial candidates during the election campaign (Category 3). Certifying their payment from State funds was criminal and the counts alleging defendants did so should be reinstated.
I would have thought the use of public funds to finance the election campaigns of the candidates of one party and defeat candidates of the opposition was so clearly unlawful that it was not worth discussion. Any other view devalues the democratic process by leaving incumbent legislators free to perpetuate themselves in office at government expense. The majority concludes otherwise, however, reasoning that partisan political activities are "proper duties” of a legislative employee. Once this premise is accepted, it follows easily that employees may be hired to engage in a broad range of purely political activities and be paid for it by the State because they are doing no more than fulfilling their public duties. The Legislature may restrict such political activities, the majority holds, but since it had not done so in 1986, defendants’ conduct was not criminal and the charges involving employees in Categories 1, 2 and 3 must be dismissed.
I know of no authority, and the majority cites none, which would support such reasoning. Political activities are private, not public, matters and the use of public funds to pay employees hired for private purposes is unlawful. Thus, the question is not whether the Legislature has ever restricted the power of its members to hire campaign workers at State expense or criminalized such conduct. It has never had the power to authorize such employment.
Accordingly, I dissent from that part of the majority opinion dismissing the counts involving campaign only workers, and would reinstate them.*
I
It is important to note at the outset that although part II of *56 the majority’s opinion is entitled "The Campaign Worker Counts”, it deals with three categories of employees. This dissent questions only dismissal of the counts relating to 18 employees; those hired to work in Democratic campaign organizations during the 1986 election campaign and promptly discharged after the election was over. The majority believe that their assignments, like the political assignments of the regular employees in Categories 1 and 2, fell in the "gray area” which separates proper public duties from improper political activities (majority opn, at 47-48). The work they performed, however, served no public purpose. On the contrary, everything they did was political. Thus, a determination that defendants were guilty of criminal conduct for certifying their payment from State funds does not involve intrusion by the Court into matters of legislative discretion (see, Saxton v Carey, 44 NY2d 545, 549; Matter of Gottlieb v Duryea, 38 AD2d 634, affd 30 NY2d 807, cert denied 409 US 1008; see also, Gilligan v Morgan, 413 US 1, 10). It involves no more than a determination of whether political activities are a part of a legislator’s public duties which may be paid for from public funds.
It is the prosecutor’s theory that defendants engaged in a scheme to hire employees at public expense to further the fortunes of the Democratic Party in the State Senate and the power of defendant Ohrenstein, the Minority Leader. He contends that defendants Ohrenstein and Babbush placed employees on their senatorial payrolls or the payrolls of various legislative commissions and directed the State to pay their salaries from funds contained in the appropriation for legislative and commission staff, falsely certifying that each campaign worker was a Senate employee who had performed "the proper duties” of an assigned position.[1] Thus, the prosecutor presented evidence to the Grand Jury that the employees in question did no work for defendants Ohrenstein or Babbush or the legislative commissions which paid them but instead were assigned to Democratic Senators seeking reelection or Democratic candidates seeking to oust incumbent *57 Republican Senators. Defendant Ohrenstein selected which candidates would receive the support provided by these State-paid campaign workers, favoring two incumbent Senators seeking reelection, and five candidates seeking either to regain seats previously lost or attempting to become Senators for the first time.
The employees performed a wide range of political duties. For example, one was assigned as an employee of the Commission for Water Resources and Needs for Long Island at a salary of $500 per week but acted as the campaign manager for one of the candidates. She was not even aware that she was assigned to a commission until terminated after the election. Another worked as a "gofer” for one of the candidates and was paid $1,400 from funds allocated to the Commission on Rural Resources. One appointee, listed on defendant Ohrenstein’s payroll as a Senate "research analyst”, received a total of $10,000 from the State for checking the biographical backgrounds of two Republican incumbents. Others were hired as publicists, campaign coordinators, poll takers or in similar jobs at comparable salaries. As Supreme Court observed, the activities of the employees were "blatantly political” (see, 139 Misc 2d 909, 922).[2]
II
As a result of these activities, defendants are charged with (1) second and third degree grand larceny (Penal Law §§ 155.40, 155.35), (2) offering false instruments for filing in the first degree by falsely certifying that the various appointees had performed "proper” legislative duties with the intent to defraud the State thereby (Penal Law § 175.35) and (3) conspiring to defraud the State (Penal Law § 105.05).
The statutes in question, like penal laws generally, do not proscribe specific practices or methods but rather focus on whether the conduct causing the injury was blameworthy. The essence of the larceny charges against defendants is that they used State funds knowing the use was unauthorized, i.e., that the funds could not be used for the private purpose of campaign activity. The defendants’ claim, accepted by the Appellate Division and the majority in this Court, is that the *58 charges cannot stand because no provision in the Penal Law defines this conduct as criminal. There is no statute proscribing payments of State funds to "no shows” either, but doing so is a crime (see, e.g., People v Riccio, 91 AD2d 693; People v Hochberg, 87 Misc 2d 1024, affd 62 AD2d 239, lv denied 44 NY2d 953). The myriad ways in which the improper use of governmental funds may be accomplished precludes such specificity and the majority, by sustaining the counts in the indictment involving "no shows”, recognize as much.
The majority asserts a specific statute is required in this case, however, because political activities are an inherent part of a legislator’s public duties. They hold that unless the Legislature proscribes the use of legislative aides for political purposes the practice is proper. The presence or absence of a statute prohibiting the specific conduct is irrelevant. As New York and every other jurisdiction which has addressed the issue has found, partisan political activities are private, not public functions, and the use of public funds for such purposes is improper (Matter of Phillips v Maurer, 67 NY2d 672, 673-674; Stern v Kramarsky, 84 Misc 2d 447, 451-452; see, 1981 Opns St Comp No. 81-26, at 25; 1980 Opns St Comp No. 80-762, at 209; 1980 Opns St Comp, No. 80-411, at 117; and see, NY Const, art VII, § 8; see also, Stanson v Mott, 17 Cal 3d 206, 551 P2d 1; Anderson v City of Boston, 376 Mass 178, 380 NE2d 628; Burt v Blumenauer, 299 Ore 55, 699 P2d 168; Commonwealth v Brownmiller, 141 Pa Super 107, 14 A2d 907). The rule is stated in Fair Political Practices Commn. v Suitt (90 Cal App 3d 125, 130, 153 Cal Reptr 311, 314): "The use of state employees by a legislator’s campaign committee to solicit contributions, plan campaign strategy, coordinate volunteers, and prepare the campaign budget, all at state expense, is in no way a proper part of a legislator’s official functions; that is not to be questioned.”
Some of these authorities relate to the use of public funds by State agencies to support propositions rather than candidates but the logic of applying them to legislative election campaigns is inescapable. Campaigning, whether for a cause or a candidate, is a private activity. The government has no interest in paying for partisan activity to obtain a particular election result. Political parties, by definition, represent only a portion of the public and their purpose is to advance the views of the group they represent. It is not possible, therefore, to render a service to the public or perform "proper duties” of the Legislature by working solely to elect the candidates of a *59 particular party or to increase the power and influence of a particular political leader. Such work has no reasonable connection with serving the public. As one commentator has noted, these principles are just "common sense” (see, Note, Use of Congressional Staff in Election Campaigning, 82 Colum L Rev 998, 1023-1024).
The necessity for the rule is apparent when viewed from a broader perspective also. Elections are the central event in any democratic society. If they are to fulfill their function, two aspects must be preserved: (1) voters must have an effective voice in choosing their representatives and (2) candidates, whether incumbents or challengers, must have a reasonably equal chance at success (see, Emerson, The System of Freedom of Expression, at 699 [1970]). Permitting the Legislature, which has access to the biggest campaign war chest of all, the public treasury, to use public funds solely for campaign purposes in an attempt to dominate elections, threatens the basic integrity of the democratic process and implicates important constitutional concepts of government neutrality and fair dealing. Manifestly, the expenditure of State funds constitutes State action. Thus, using State funds to promote the election of some candidates and to defeat others involves no less than government control of expression and the denial of equal protection of the laws (see, e.g., Buckley v Valeo, 424 US 1, 98, n 133; Shakman v Democratic Org., 435 F2d 267, 270 [7th Cir], cert denied 402 US 909; Citizens to Protect Pub. Funds v Board of Educ., 13 NJ 172, 98 A2d 673 [Brennan, J.]; Anderson v City of Boston, 376 Mass 178, 191, n 14, 380 NE2d 628, 637, n 14, supra; Note, Use of Congressional Staff in Election Campaigning, 82 Colum L Rev 998, 1012-1013).[3] There simply are no policy considerations in favor of holding political campaign activities part of the official and proper duties of legislative officeholders and, more importantly, there are compelling reasons for not doing so.
The majority, in holding that political activities are part of a legislator’s public duties, has failed to distinguish between the many legitimate representational activities performed by *60 legislative staff, e.g., distributing newsletters and answering constituent inquiries, and those purely political activities directed at securing reelection.[4] There is a world of difference between paying a staffer performing proper and legitimate duties to handle constituent concerns, however, and paying an employee from funds appropriated for the Commission on Water Resources to be the campaign manager for a Democratic candidate seeking to oust a Senate incumbent. The former is perfectly proper; the latter most certainly is not. We have noted the distinction (see, Matter of Phillips v Maurer, 67 NY2d, at 673-674, supra), as have several other courts (see, Hoellen v Annunzio, 468 F2d 522 [7th Cir], cert denied 412 US 953; Bellardino v Murphy, 364 F Supp 1223, 1224 [SD NY]; Rising v Brown, 313 F Supp 824, 826-827 [CD Cal]). Indeed, the Legislature itself recognized the distinction when it adopted Concurrent Resolution No. 812-87. It provided that official duties of legislative employees may include "representational activities, such as constituent casework, preparation of news releases and newsletters to constituents, public appearances and other responsibilities which are not political campaign activity” (see, Resolution No. 812-87, adopted Apr. 9, 1987, at 2, paras 3, 4 [emphasis added]). It is also significant that the resolution addressed the problem which divides this Court and prohibited legislators from hiring employees "to engage solely in political campaign activity” (see, id., para 2).
*61 The majority in support of its position that staffing Democratic headquarters and campaign organizations at public expense is in the "gray area” between legitimate representational activity and purely political activity, cites the prosecutor’s acknowledgment that sometimes differentiation between the two is difficult. The prosecutor did not concede that the work performed by the campaign-only employees was proper in this case, however. He contended that the activities of employees in all three categories covered by the indictment were not "even near” the gray area (reply brief, at 2). He can hardly be faulted for his position when the Legislature has agreed with it (see, Resolution No. 812-87). Defendants’ actions, he maintained, "fit squarely within the black and white realm of larceny and fraud” (reply brief, at 2). It is difficult to disagree with that assessment when workers in Category 3 did only political work, many were on commission, not Senate payrolls, and most worked to elect five private citizens seeking office and could not be performing public duties of a representational nature for legislators.
If the State had given conflicting interpretations of the propriety of hiring campaign workers at public expense, defendants could reasonably contend that they acted in good faith and that the authorities cited should not serve as a predicate for conviction under the general Penal Law provisions. But neither the New York courts nor the State’s agencies have ever authorized this conduct. Quite the contrary, they have uniformly condemned the use of public funds for political purposes (see, Matter of Phillips v Maurer, supra; Stern v Kramarsky, supra; and various Opinions of the State Comptroller, supra, at 58).
Moreover, defendants knew the law on the subject for they had researched the issue themselves. In 1982 and 1983 defendant Ohrenstein and his Chief Counsel conducted an investigation of the use of public funds for campaign activities, they subsequently scheduled the topic for discussion at the Minority Conference Steering Committee meeting, and in 1984, two years before the events covered in this indictment, defendant Ohrenstein retained a law professor to thoroughly research the question. The professor issued a 26-page opinion which discussed the Penal Law provisions at issue and analyzed most of the same judicial authorities relied on in this dissent. He concluded that the use of legislative employees for campaign purposes could be illegal. More importantly, he carefully *62 distinguished between staffers who performed legislative functions but devoted part of their time to political activities and employees hired solely for campaign purposes, noting that while permanent staffers might justifiably use free time for political activities, the employment of persons at public expense solely for campaign work would present grave questions under the Penal Law sections relating to larceny, offering false instruments for filing and theft of services.[5] Instead of heeding their lawyer’s warnings or inquiring of State agencies about the propriety of their intended conduct, however, defendants chose to hire people at public expense to staff these Senate campaigns.
Defendants also claim that in hiring campaign-only workers they acted in a good-faith belief their conduct was proper but the prosecutor introduced substantial evidence indicating otherwise. Perhaps most telling are the payrolls themselves. Had defendants genuinely believed that campaigning was a proper public duty, they would have identified the employees listed on the payroll certifications as "campaign workers”, not as "research assistants”, "legislative aides”, etc. Moreover, had they believed their conduct proper, there would have been no need for the efforts revealed in the Grand Jury testimony to conceal the payments from the public. There was evidence, for example, that one candidate had two "campaign managers”, one figurehead whose name was disclosed to the press and a counterpart not publicly acknowledged but paid by the State; that several "farmed out” staffers were instructed to avoid the media or to use pseudonyms when dealing with reporters so that they would not be recognized; that campaign workers paid from public funds left campaign headquarters at the first sign of a reporter to avoid disclosure and that message boards at campaign headquarters were altered to avoid reporters recognizing names. These actions bespeak guilty knowledge, not a good-faith belief by defendants that their conduct was permissible under the law.
*63 III
Based on this authority, the counts of the indictment charging crimes committed by the use of legislative and commission payrolls to pay those employed for campaign-only duties come within existing provisions of the Penal Law and the evidence before the Grand Jury is sufficient to sustain them.
Defendants authorized payment of public funds for private purposes and thus their conduct fell squarely within the scope of provisions proscribing larcenous acts. Larceny is a crime against the rightful owner of property. It is complete when the owner’s possession is disturbed by one intending to convert the property to his or her own use either permanently or for an unreasonable period of time (see generally, 2 LaFave & Scott, Substantive Criminal Law § 8.5). In this case, defendants’ right to use public funds was limited by the appropriation authorizing them to pay legislative employees for performing "proper duties.” The funds were trust funds and had to be used for authorized public purposes. If defendants certified payment of funds for purposes beyond the authorization, they abused their trust, converting the property to their own use in violation of the larceny statute (see, People v Riccio, supra; People v Hochberg, supra; People v Page, 182 Misc 253; see also, Penal Law § 155.05 [2] [a]).
The charge of offering a false instrument for filing was supported by evidence before the Grand Jury that defendants knowingly presented an instrument containing false information to a public office or servant, "with intent to defraud” the State (see, e.g., People v Chaitin, 94 AD2d 705, affd 61 NY2d 683; see also, Penal Law § 175.35). By submitting payrolls containing the names of campaign-only workers and describing them as legislative or commission employees, defendants affirmed information that was false on two grounds. It was false because the employees were not working in the commissions or positions specified and it was false because they were not performing the "proper duties” of the "position specified” in the payroll but instead were working solely on political campaigns.
IV
There is no need to consider defendants’ constitutional defenses. This prosecution does not violate the speech or debate protections of our Constitution for the conduct alleged *64 has not the remotest connection to any legislative function (NY Const, art III, § 1; see, United States v Brewster, 408 US 501, 510-513). Nor does prosecution of the charges involving the campaign-only workers violate separation of powers or political question principles (see, Matter of Gottlieb v Duryea, 38 AD2d 634, affd 30 NY2d 807, cert denied 409 US 1008, supra). Defendants had no power to hire workers for campaign purposes at public expense. The majority’s concerns, therefore, that the courts or executive branches will encroach on legislative power or interfere with the exercise of legislative discretion are not implicated in these charges. The determination that their conduct was illegal involves no more intrusion into legislative activities than finding it criminal to pay "no show” workers.
V
Legislators are trustees of the public treasury. They may appropriate and spend State funds to the extent authorized, but if they do so to benefit themselves or others personally, they commit a crime. The majority, noting that legislators are authorized by constitutional and statutory provisions to retain staff for the performance of their public duties, maintains that it is the Legislature’s function to determine the scope of this "extensive grant of authority”. Inasmuch as it had not enacted a statute in 1986 prohibiting members from hiring employees to perform solely political functions, defendants may not now be held criminally liable. In the majority’s opinion, the Legislature’s notion of propriety is the "prevailing view”. The Legislature having failed to criminalize defendants’ conduct, the courts have no role in the matter now even if "excesses]” occurred (majority opn, at 47, 48, 49).
To allay concern over the breadth of this extraordinary power, the majority contends that defendants’ conduct cannot be repeated in the future because the Legislature prohibited it in 1987. To the extent that the 1987 legislation addresses the issues before us, it is irrelevant. The Legislature does not have the power to authorize the use of funds for private purposes and it is a matter of no legal consequence, therefore, that it has restricted the exercise of power it does not possess.[6] The *65 majority’s assertion that defendants’ conduct cannot be repeated, notwithstanding its concession that the Legislature possesses the authority to finance purely political campaign activities at State expense and its broad view of the Legislature’s power over its employees virtually assures that similar conduct will occur in the future. Only the bounds of human ingenuity will limit it. Accordingly, I dissent and would reinstate the counts relating to the 18 employees who worked only on campaigns.[7]
Judges Kaye, Alexander, Titone, Hancock, Jr., and Bellacosa concur with Chief Judge Wachtler; Judge Simons dissents in part and votes to modify in a separate opinion.
People v Ohrenstein: Order affirmed.
Matter of Ohrenstein v Morgenthau: Judgment affirmed, without costs.

. The payroll certification contained on the payroll form stated: "This is to certify that the persons named in the payroll listed above are employed by the New York State Senate in the position Specified and have actually performed the proper duties of the position for the period described. I further authorize the mailing of checks to employees listed under Mailing Authorization. I affirm that the employees listed are assigned to me and that this payroll certification is correct” (see, 2 NYCRR 3.12).

. The facts are set forth more fully in the dissenting opinion at the Appellate Division (People v Ohrenstein, 153 AD2d 342, 376 [Sullivan, J., dissenting]) and the opinion of Justice Rothwax (139 Misc 2d 909).

. These principles do not render legislation for the public financing of political campaigns unlawful. It is only the partisan use of the public treasury which is prohibited. Public financing of election campaigns has been upheld because the legislation authorizing it was evenhanded in administration and not partisan in effect (see, Buckley v Valeo, 424 US 1, 91-96). No such legislation authorized the activities in question here, however, and clearly none could have done so.

. The majority cites Hutchinson v Proxmire (443 US 111) for the proposition that political campaign activities are considered an inherent part of an elected official’s job and "thus perfectly legitimate acts for a legislator or legislative assistant to perform” (majority opn, at 47). I have no disagreement with the majority over the right of legislators or their legitimate employees to engage in campaign activities on their own time. That is far from saying, however, that campaign activities may be paid for at public expense. The Hutchinson decision certainly is not authority for that proposition. In Hutchinson (supra, at 133) the Court held that speech or debate immunity did not apply to the act of a legislator informing the public of his views alone, holding it was "not a part of the legislative function or the deliberations that make up the legislative process.” Thus, there can be no serious contention that Supreme Court directly or indirectly approved the use of government funds to employ persons exclusively to perform political campaign activities of a candidate or held it a proper public purpose.
Similarly, the majority’s suggestion that the 1945 recommendation of the Joint Legislative Committee (1945 NY Legis Doc No. 35) authorized paying campaign workers from State funds is erroneous (see, majority opn, at 48). The report recognized that employees who have properly performed legislative duties may also engage in political activities. It does not recognize, however, that the legislative payroll may be used to pay persons who do nothing other than political campaign work.

. That view was hardly novel. In 1982, Assembly Speaker Stanley Fink noted the potential for misuse of public funds for election purposes and proposed that the Legislature adopt rules governing the use of legislative employees in election campaigns. In 1985 the District Attorney of Kings County also investigated the use of public funds for political purposes. Inasmuch as the inquiry concerned political activities of staff also performing legislative functions, in contrast to the campaign-only employees considered here, she declined to prosecute. Noting the serious problems involved with such expenditures, however, she urged the Legislature to establish appropriate standards for the future. Neither proposal was acted upon.

. Resolution No. 812 was adopted in April 1987, slightly less than a month before the prosecutor began presenting these charges to the Grand Jury. Even assuming the majority’s premise that the Legislature alone has *65 the power to determine the propriety of this conduct, the Resolution does not do so. It called for the formation of a Blue Ribbon Commission to investigate and report on the use of public employees for political purposes and established "Interim Guidelines” until permanent standards could be adopted. In the meantime, the employment of legislative staff was a matter of discretion with individual legislators, subject to the provisions noted above (infra, at 60). A concurrent Resolution of the Legislature does not have the force of law, however, and it is not clear how it could criminalize conduct that the majority believe was lawful before the Resolution was passed. At best, this Resolution provides notice to the legislators. The majority does not decide this case on notice grounds, however, and as demonstrated above, the legislators had notice without the Resolution.
The Ethics in Government Act (L 1987, ch 813) established a broad system of financial reporting for certain public employees and restricted various outside employment and associations and The New York State Government Accountability, Audit and Internal Control Act of 1987 (L 1987, ch 814) established certain accounting and reporting procedures. Neither statute addresses the use of public employees for private purposes.

. The counts of the indictment charging defrauding the government (No. 577) and theft of services (No. 578-583) should be dismissed, however, because they involve employees who had performed legitimate duties of the Legislature and the conspiracy count (No. 1) should be modified to include solely the acts relating to the campaign-only workers.