OPINION OF THE COURT
Harold J. Rothwax, J.
Following the Court of Appeals favorable ruling on the defendants’[1] petition for a writ of prohibition against continued prosecution, based upon the absence of fair notice that use of the State legislative payroll to hire persons exclusively to work in political campaigns of insurgent Democratic candidates was larceny (People v Ohrenstein, 77 NY2d 38, 52 [1990]), the indictment herein was reduced to those counts of offering a false instrument for filing (Penal Law § 175.35) and grand larceny (Penal Law former §§ 155.35, 155.30) which alleged that the defendants placed on the State legislative *514 payroll "employees [who] did nothing, that the defendants knew this and that the defendants also knew that they [the employees] had no duties.” (77 NY2d, supra, at 53.)
The remaining 98 counts (see, People v Ohrenstein, 153 AD2d 342, 376 [1st Dept 1989]) pertain to the enrollment of Arnold Smith and Joseph Walsh on the payroll of Senator Ohrenstein’s district office, and to the enrollment of Carmen DelPriore on the payroll of the Senate Minority Leader. Specifically, Senator Ohrenstein and his chief of staff, Frank Sanzillo, stand charged with two counts of grand larceny for causing Smith to be paid a biweekly salary from September 19, 1985 to January 8, 1986 and from January 9, 1986 to July 24, 1986; and with one count of grand larceny for causing Walsh to be paid a biweekly salary from June 2, 1983 to July 9, 1986. Senator Ohrenstein, Sanzillo and Joseph Montalto are charged with a single count of grand larceny for causing DelPriore to be paid on the Senate payroll from August 21 to November 12, 1986 during Montalto’s bid to regain his former Senate seat. It is alleged that Ms. DelPriore worked neither for the Senate nor for the campaign. Corresponding counts of offering a false instrument for filing allege that defendants falsely certified to the State Senate that these enrollees on the payroll had performed "proper duties” of an employee of the Senate, when in fact defendants knew that they had performed no such duties during the periods specified.
The defendants renew their previous motion to dismiss the indictment on grounds of legal insufficiency of the evidence to sustain the remaining counts (CPL 210.20 [1] [b]), and of alleged defects in the Grand Jury proceedings (CPL 210.20 [1] [c]). The defendant Montalto also renews his motions for severance and to dismiss the prosecution in the interests of justice. (CPL 210.20 [1] [i].)
As originally framed, the indictment alleged a broad conspiracy centering upon the use of the legislative payroll to compensate campaign workers during the 1986 State senatorial elections. (See, People v Ohrenstein, 139 Misc 2d 909 [Sup Ct, NY County 1988].) The People’s theory of the conspiracy was that campaign work was not among the "proper duties” of State legislative employees, and thus that certification of campaign workers to receive State salaries was larceny. The Court of Appeals, in dismissing the counts pertaining to campaign workers, was careful to note that "statutes dealing genetically with theft provide a basis for prosecution in cases where government employers use State employees for activi *515 ties which are prohibited or are not within the employees’ duties as defined by statute, rule or regulation. The point we are making * * * is that at the time the defendants acted, their conduct was not prohibited in any manner; nor could they have known that they were subject to criminal prosecution for their acts; there was no statute, nor was there any rule or regulation defining the duties of legislative assistants or limiting the nature or extent of their permissible political activities. In a criminal prosecution where these defendants are charged with engaging in activities prohibited by law, the absence of any such legal prohibition is fatal to the prosecution.
"Our holding is a narrow one based on circumstances which no longer exist. As indicated, the Legislature, acting as employer, has now adopted a joint resolution which defines some of the duties of legislative assistants and imposes limitations on a legislator’s use of such assistants. * * * The joint resolution specifically addresses the dissenter’s concerns and prohibits legislators in the future from hiring staff assistants solely to work in political campaigns.” (People v Ohrenstein, 77 NY2d, supra, at 52.)
The basis for the Court of Appeals holding is important to resolution of the parties’ contentions.
The defendants argue that the Court of Appeals determination that the use of the legislative payroll to staff campaigns was not expressly prohibited in 1986 not only establishes that evidence of the alleged conspiracy was inadmissible before the Grand Jury, but also means that the prosecution’s characterization of such conduct as criminal impaired the integrity of the Grand Jury’s fact-finding and accusatory process. Consequently, the defendants argue, a new presentation is required, limited to evidence and legal instructions regarding alleged "no show” employees.
The People counter that the Court of Appeals implicitly recognized that as a matter of "policy and ethics” the defendants’ use of the legislative payroll to promote candidates of their persuasion was improper and the expenditure unauthorized. (See, 77 NY2d, supra, at 48, 52.) Hence the People reason, evidence of the use of the State payroll to employ campaign workers is a "bad act” and is relevant as part of a "common scheme or plan” to use the legislative payroll for the defendants’ political ends, encompassing both the employment of campaign staff and political "no shows”. The rele *516 vanee of the evidence of campaign employment to the remaining charges is, the People argue, to show that the defendants knew that the State payroll was being used to compensate persons who were not performing the "proper duties” of legislative employees.
The court finds neither argument persuasive, for the following reasons.
IMPACT OF DISMISSAL OF THE CONSPIRACY AND RELATED COUNTS ON THE INTEGRITY OF THE ORIGINAL GRAND JURY PRESENTATION
The alleged error in the Grand Jury presentation at issue here is essentially the introduction of retrospectively inadmissible evidence of acts characterized as illegal, which had not been delineated clearly as such by law. The acts so characterized are not, of course, those currently underlying the remaining charges. The issue, therefore, is whether the receipt of evidence of those acts so characterized impaired the ability of the Grand Jury to fairly evaluate the evidence legally admissible as to the remaining counts. Similar problems have arisen in the context of appellate review of trial verdicts, but the court is unaware of specific precedent in the Grand Jury context. The cases cited by the defendants pertain to the introduction at trial of inadmissible evidence of acts of the defendant (People v Blackette, 71 AD2d 1027 [2d Dept 1979]) or of others improperly joined with the defendant (People v Castro-Restrepo, 169 AD2d 454 [1st Dept 1991]) from which the jury is allowed to infer the defendant’s guilt. Some guidance may be obtained from such cases. (See, e.g., People v Thompson, 116 AD2d 377, 382 [evaluating the impact of evidentiary error before the Grand Jury according to standards developed in context of appellate review of trial verdicts].)
The Supreme Court has held that the defendant is not deprived of the constitutional right to indictment by a Grand Jury where proof at trial establishes only one aspect of a broader offense, as long as the charges sustained at trial were wholly included within the indictment voted by the grand jurors. (United States v Miller, 471 US 130 [1985].) This is so despite the argument that the Grand Jury, in its discretion, might not have returned an indictment solely upon evidence of the more limited charge. Therefore, the appellate narrowing of the theory of prosecution in the instant case cannot be *517 said to have denied the defendants of their constitutional right to indictment by Grand Jury, as a matter of law.
Often in conspiracy prosecutions, the evidence at trial proves multiple conspiracies instead of the single broad conspiracy alleged in the indictment. Where the trial evidence connects the defendant only to one of these conspiracies, the issue arises whether the impact of the evidence which would have been inadmissible against the defendant but for the misjoinder of multiple conspiracies, deprived the defendant of a fair trial. Courts apply the doctrine of harmless error in these cases. (See, Kotteakos v United States, 328 US 750 [1946].) The considerations relevant in that context are useful to resolution of the issues here. Assuming the existence of legally sufficient evidence to support the judgment, those courts prescribe an examination of "the character of the proceeding, what is at stake upon its outcome, and the relation of the error asserted to casting the balance for decision on the case as a whole” (supra, at 762). The Supreme Court in Kotteakos provides the following advice: "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. * * * But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error had substantial influence.” (328 US, supra, at 764-765.)
In Kotteakos (supra), the Supreme Court found that the evidence established eight separate conspiracies, of which the defendant participated in only one. The trial court erroneously instructed the jury that it could find a single conspiracy based upon the association of all the other alleged conspirators with the central figure. In fact, none of the various enterprises depended for its success on any of the others. The Supreme Court ruled that this error, which allowed the jury improperly to consider declarations and acts of other misjoined "conspirators” otherwise inadmissible against the defendant, as if they were his own, permeated the entire trial and made impossible the determination that the error had no *518 effect on the verdict as to the individual defendant. Moreover, the defendant was prejudiced by "[t]he dangers of transference of guilt from one to another across the line separating conspiracies”. (328 US, supra, at 774.)
Applying these principles to the evaluation of the Grand Jury proceedings here, the court finds with reasonable assurance that evidence of use of the legislative payroll to staff campaigns did not substantially affect the Grand Jury’s decision to indict the defendants in regard to the "no shows” who were not hired in the context of a political campaign. The facts in regard to the employment of Smith and Walsh were unrelated to any campaign activity. As noted by this court in its previous opinion (People v Ohrenstein, Sup Ct, NY County, July 27, 1988, slip opn, at 3 [index No. 10173/87]), these employments were separate in time, in circumstance, and in purpose from the "campaign” conspiracy. Both Walsh and Smith were put on the district office payroll, which was not otherwise allegedly used to hire campaign workers. Both were enrolled before the alleged conspiracy commenced. The allegations regarding Walsh antedate the alleged conspiracy by three years, and those regarding Smith antedate the alleged conspiracy by one year. Both employments were terminated four months prior to the conclusion of the 1986 campaign and five months prior to the termination of those hired solely to staff campaigns. These men were allegedly placed on the payroll at the request of political club leaders by Senator Ohrenstein based upon their long service to their respective political clubs and relation to their respective leaders. The motive in placing these men on the payroll allegedly was to favor the clubs, not to elect any candidate. There was no evidence that the political leaders on whose recommendation these alleged "no shows” were hired, played any role in the 1986 senatorial campaigns. Therefore, it is reasonably certain that the grand jurors were not substantially swayed by the evidence of campaign hiring, to return these counts.
Nor does the court find the prosecutor’s error in characterizing the use of legislative funds to pay campaign workers as a knowingly criminal act, to have prejudiced the defendants in regard to the return of these "no show” counts. All of the courts reviewing the record have recognized from the inception of the prosecution that the counts regarding the employment of Smith and Walsh rested upon a legal theory distinct from the theory that campaigning was not properly a legisla *519 tive duty. "Here there is no question as to what 'proper duties’ include, because no matter how they are defined, they must at least include the performance of some services, of some type, at some time.” (People v Ohrenstein, 77 NY2d, supra, at 53; see also, 153 AD2d, supra, at 374-375.) Insofar as both Walsh and Smith testified that they were never asked to perform a service for their salaries, the Grand Jury did not have to consider the issue of the propriety of campaign work in returning these counts. Nor can it be said, as defendants suggest, that the grand jurors believed that the practice of hiring on political recommendation was criminal. Unlike campaign workers, Senate staff who were hired on recommendation of political leaders but who performed services were not the subject of criminal charges. Evidence that the "no shows” were hired on the recommendation of political club leaders was not relevant to place the practice within the context of the broader conspiracy, as suggested by the defendants, but to show motive for knowingly permitting such hires to draw salaries without performing a service.
The court is not persuaded that the extensive evidence of a concerted enterprise to use the legislative payroll to elect a Democratic Senate majority in 1986 and the prosecution’s position before the Grand Jury that the practice was criminal had no significant effect on the grand jurors’ decision to return an indictment with regard to the employment of Carmen DelPriore. DelPriore was hired in the context of the Montalto campaign, although the evidence shows she did no campaign work. She was hired by Sanzillo at the behest of the candidate, Montalto. It is certain that the Grand Jury believed that the defendants Ohrenstein and Sanzillo were motivated by the objectives of the larger conspiracy to hire DelPriore. It is equally certain that the grand jurors believed that it was unnecessary to determine whether Sanzillo and Senator Ohrenstein anticipated that DelPriore would work in the campaign, since the People’s theory of the case was that campaign work was not a "proper duty”. Therefore, the court cannot find with confidence that the People’s erroneous theory had no bearing on the Grand Jury’s decision to vote these counts as to Senator Ohrenstein and Sanzillo. Since the Grand Jury may have found that these defendants believed that DelPriore would perform campaign work, and may have returned these counts upon the theory that such work was then unauthorized, the court finds that Senator Ohrenstein and Sanzillo were prejudiced by the erroneous theory as to these *520 counts, which are accordingly dismissed. (Cf., People v Castro-Restrepo 169 AD2d 454, supra.)
The court does not find similar prejudice in regard to the defendant Montalto, however. As the Appellate Division found, the evidence established that Carmen DelPriore did no work for the Montalto campaign. In fact, her father testified that he complained to Montalto’s campaign personnel that she had been put on the Senate payroll but had not been given a job to do. Montalto’s campaign manager did not even know that DelPriore had been put on the Senate payroll until he complained to Montalto about the quality of the printing work being done by Diorio. Montalto replied that he had arranged with Sanzillo for the daughter of Diorio’s friend (DelPriore) to be on the payroll. It was a fair inference from this comment that Montalto put DelPriore on the Senate payroll to encourage Diorio, since Montalto had previously offered to put Diorio (who already had a State job) on the Senate payroll and ultimately put DelPriore on the payroll at Diorio’s request. In light of the fact that Montalto’s campaign manager had no knowledge of DelPriore, it was also a fair inference that Montalto did not expect any service from DelPriore to the campaign. Montalto told a club leader that he put DelPriore’s daughter on the payroll to help DelPriore for all the work he had done for the club. After Montalto learned of the investigation which led to these charges, he told the leader that Carmen DelPriore had not done any work, although according to Montalto, he sent Carmen DelPriore "to 270 Broadway with a recommendation and she was supposed to work there”. This statement was flatly contradicted by the testimony of Carmen DelPriore and of her father. The Grand Jury was justified in inferring a consciousness of guilt on Montalto’s part, based on this falsely exculpatory explanation. (See, e.g., People v Moses, 63 NY2d 299, 308 [1984].) The evidence in regard to the availability of the legislative payroll in 1986 to hire campaign workers was relevant to proof of Montalto’s ability to place DelPriore on the payroll. The People’s position that campaign work was unlawful was not prejudicial to Montalto in this regard, however, insofar as there was evidence sufficient to sustain the inference that Montalto did not employ DelPriore with the expectation that she would perform any service to his campaign. Therefore, these counts are sustained as to the defendant Montalto.
Defendant Montalto’s motion for severance is granted, as proof of the alleged larceny and false instrument charges in *521 regard to the employment of Carmen DelPriore depends upon evidence wholly unrelated to the employments at issue in the remaining counts. For the reasons discussed herein, the court rejects the People’s contention that all of the counts remaining in the indictment are encompassed within a common criminal scheme or plan. (CPL 200.40 [1] [b]; see, People v Ruiz, 130 Misc 2d 191 [Sup Ct, NY County 1985].)
SUFFICIENCY OF THE EVIDENCE
The statutes require that the defendants have known that the representation that Smith and Walsh were performing a service was false. This court’s review is limited to determining whether there was evidence before the Grand Jury from which the element of knowledge reasonably could have been inferred, leaving aside questions as to the quality or weight of the evidence. (People v Jennings, 69 NY2d 103, 114-115 [1986].) The evidence of the defendants’ knowledge was entirely circumstantial. Both Sanzillo and Senator Ohrenstein signed payroll certificates in regard to Walsh and Smith.
Significant, with regard to the defendant Sanzillo, was the testimony of Senator Ohrenstein’s district office director, Tom Loeb, that when he informed Sanzillo in 1985 that Walsh was not working and suggested that Walsh be fired, Sanzillo did not express surprise or allow Loeb to fire Walsh. The Grand Jury could infer from Sanzillo’s response (or lack of response) that he had prior knowledge of the fact. The Grand Jury could also infer that Sanzillo was aware that Smith was on the district office payroll for several months in 1985 prior to his direction to Loeb to "put him to work”. Smith’s testimony that no one directed him to work until 1987, when Loeb informed him that he then would "have to work” for his salary increase, was a proper basis for an inference that Sanzillo knew that Smith continued not to work in 1986. Sanzillo’s purported desire to have Smith and Walsh work could have been dismissed by the Grand Jury in light of evidence that he was aware that they were not working and did not exercise his authority to remove them from the payroll. While the weight of this evidence might not suffice beyond a reasonable doubt, it is sufficient at the accusatory stage. (People v Jennings, supra.)
Senator Ohrenstein acknowledged that he hired Smith at the request of District Leader Neuchow, and hired another person at the request of District Leader McManus. Walsh *522 testified that McManus recommended him to Senator Ohrenstein. Neither of these men was interviewed at the chief of staff or even district office level. Neither was assigned a specific job or given supervision. It was known to the district office staff and to Ohrenstein’s chief of staff that the men did not work. Nonetheless, neither was removed from the payroll. It was not until 1987 that Senator Ohrenstein inquired whether Smith was working. This inquiry was some evidence of Senator Ohrenstein’s awareness that Smith had not worked in the past. The evidence also showed that the Senator annually reviewed the payroll with his senior staff. Walsh was on the payroll for four years without ever appearing in the district office. The district office consisted of a staff of 10, including the part-time employees. The evidence showed that Senator Ohrenstein visited the district office, particularly during nonsession periods.
The single most compelling fact, in the court’s view, from which the Grand Jury reasonably could have inferred Senator Ohrenstein’s knowledge that these political hires would be paid even though they performed no service, was the reluctance of Sanzillo to remove them from the payroll in spite of the complaints of his district office director, in light of the following.
Senator Ohrenstein’s chief of staff prior to Sanzillo testified that people recommended to the Senator by district leaders would "usually” be placed on the district office staff at Senator Ohrenstein’s direction, although some of these were placed on the minority staffs of legislative commissions. The prior chief of staff did not involve himself directly with the district office. However he testified that he "got very nervous” about minority staff assigned to commission payrolls without working, and assigned a supervisor to make sure that commission staff were working. Sanzillo became Senator Ohrenstein’s chief of staff in 1984. In late 1984, Sanzillo and Senator Ohrenstein met with the counsel to the minority "to discuss employees whom [sic] in Frank’s view might not have been performing the amount of work they should have been or necessary work or perhaps even any work”. The witness recalled that some of these employees "were political” and had predated Sanzillo’s promotion. Senator Ohrenstein’s position at the meeting was that his staff should meet with these employees "to see whether or not they were working up to a level that would be considered work”, and that they should be supervised. Senator Ohrenstein’s counsel "argued more strenuously for termination”. *523 The "sense of the conversation” was not to fire these people. An effective program to remove people who did no work from the minority staff was not implemented due to Senator Ohrenstein’s "reluctance”. In the court’s view, this testimony in light of all of the other circumstances suffices prima facie to establish knowledge within the meaning of the Penal Law.
The drafting of Penal Law of 1965 (L 1965, ch 1030) was particularly influenced in its general provisions by the Model Penal Code. (People v Goetz, 68 NY2d 96, 109 [1986].) Among the general provisions is the statutory definition of knowledge, which includes an awareness that the circumstances described by the statute defining the offense, exist. (Penal Law § 15.05 [2].) Among the provisions of the Model Penal Code is the concept of conscious avoidance, which states that when "knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence, unless he actually believes that it does not exist.” (Model Penal Code § 2.02 [7] [Proposed Official Draft 1962].)[2] The concept, which was recognized at common law (see, Perkins, Criminal Law ch 7, at 776 [2d ed 1969]; People v Sugarman, 216 App Div 209, 215 [1st Dept 1926], affd 243 NY 638), states a principle of proof, rather than a standard of culpability. (See, Perkins, "Knowledge” as a Mens Rea Requirement, 29 Hastings LJ 953, 964 [1978].) The principle is that upon proof of an awareness of facts which indicate a high probability of unlawfulness, proof of a purposeful avoidance of learning the truth justifies an *524 inference of guilty knowledge. (See, e.g., United States v Lanza, 790 F2d 1015 [2d Cir 1986], cert denied sub nom. Lyubarsky v United States, 479 US 861.)
In the instant case, the requisite high degree of probability of the existence of incriminating circumstances was established by proof that the defendant Ohrenstein, having placed on his payroll political employees some of whom he was told were not earning their salary, implemented an irregular practice of preventing these nonworkers from being removed from the payroll, and thereafter consciously avoided determining whether such employees worked. This practice led inevitably to the continuation on the payroll of Smith and Walsh, despite their failure to work. (See, People v Sugarman, 216 App Div 209, 215, supra; see also, People v Riccio, 91 AD2d 693, 694 ["Having set in motion the events leading to Paparian’s placement with no intent that she actually work, defendant is responsible for the direct result”].) This awareness, coupled with the specific knowledge of Senator Ohrenstein’s district office director, imparted to his chief of staff, that Smith and Walsh did no work, and with Senator Ohrenstein’s periodic review of staff and salaries with his chief of staff, is sufficient to permit a prima facie inference that Senator Ohrenstein knew that Smith and Walsh were being carried on the payroll without performing a service. (People v Sugarman, supra.) At trial, the petit jury will have to determine, in order to find knowledge beyond a reasonable doubt, that Senator Ohrenstein did not actually believe that Smith and Walsh were expected to perform a service. (See, United States v Shareef, 714 F2d 232 [2d Cir 1983]; see, People v Calbud, Inc., 49 NY2d 389.)
The defendants’ motions are granted to the extent of dismissing as to the defendants Ohrenstein and Sanzillo those counts which pertain to the employment of Carmen DelPriore, and severing the prosecution of defendant Montalto from the other defendants as to those counts. The defendants’ motions are otherwise denied for the reasons set forth herein.

. The prosecution of Senator Babbush has been severed. (See, People v Babbush, 150 Misc 2d 174 [Sup Ct, NY County 1991].)

. Although the reviser’s notes are silent as to the intended scope of the definition of knowledge within the Penal Law, and this specific provision was not incorporated into the Penal Law, the court is persuaded that the definition of knowledge was intended to encompass the concept of conscious avoidance. Under recognized principles of statutory interpretation, legislative intent may be determined by reference to the manner in which words associated with the term to be construed are used in other aspects of the statute. (McKinney’s Cons Laws of NY, Book 1, Statutes § 239 [a].) In another part of the general provisions of the Penal Law, the Legislature used the words "believing it probable” to mean knowing. Penal Law § 115.00 defines a criminal facilitator as one who provides the means of committing a crime to another "believing it probable” that he is rendering such aid (emphasis added). The staff notes, official commentator, and courts all construe this phrase to mean aiding the commission of a crime with knowledge that one is doing so. (See, Staff Notes of Commn on Rev of Penal Law and Crim Code, Proposed NY Penal Law, McKinney’s Spec Pamph, at 328 [1964]; People v Kaplan, 76 NY2d 140, 146 [1990].) Accordingly, as a matter of statutory interpretation, it would appear that the Legislature equated belief in the probability of circumstances with knowledge, for purposes of general principles of culpability.